NATIONAL ENAMELING & STAMPING CO. et al. v. NEW ENGLAND ENAMELING CO.

(Circuit Court of Appeals, Second Circuit. December 4, 1906.)

No. 174.

1. PATENTS—CONSTRUCTION OF CLAIMS—REFERENCE TO SPECIFICATION.

The claim in a patent is the measure of the invention, and, while the specification may be referred to for the purpose of explaining any ambiguity in the claim, it cannot be referred to for the purpose of expanding or changing the claim.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 241.]

2. SAME—VALIDITY—ENAMELED METAL WARE.

The Claus patent, No. 527,361, for an improvement in enameling metal ware, claims 4 and 6, which cover as a new article of manufacture a metallic article having a coat of enamel of "an intensely alkaline nature" and "a mottled coat of alkaline enamel," respectively, and claim 8, which covers an enamel for surfaces having "a preponderance of alkaline constituents," each closing with the words "substantially as described," are void because they do not describe or cover the invention, if any, made by the patentee, since neither the completed enamel or "dip" of claim 8, made from the ingredients and by the process described in the specification, nor the burned enamel on the completed article as so made are alkaline, nor do they contain a preponderance of alkaline constituents. Claims 5 and 7, covering as a new article of manufacture a steel article having a single coat of mottled enamel, and in the latter claim also metallic oxides extending from the outer surface of the enamel inwardly, are also void for lack of novelty, in view of the prior art.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 139 Fed. 643.

William Houston Kenyon, Robert N. Kenyon, and Walter F. Rogers (Steinhardt & Goldman, solicitors), for appellant.

Arthur v. Briesen and Louis Marshall (Guggenheimer, Untermeyer & Marshall, solicitors), for appellee National Enameling & Stamping Co.

Walter D. Emonds, for appellee Lalance & Grosjean Mfg. Co.

Before WALLACE and COXE, Circuit Judges, and HOLT, District Judge.

HOLT, District Judge. This suit was brought to restrain the alleged infringement of United States patent 527,361, dated October 9, 1894, granted to Hubert Claus for an improvement in enameling metal ware. The patent contains 13 claims. Claims 1 to 7, inclusive, are for the finished enameled article as a new article of manufacture. Claim 8 is for the enamel itself as prepared, and before it is applied to the surface of the metal. Claims 9 to 13, inclusive, are process claims. The court below held that claims 1, 2, and 3 were invalid, that claims 4, 5, 6, 7, and 8 were valid and infringed, and that claims 9, 10, 11, and 12 were not infringed. Claim 13 was not involved in this suit. The defendant's appeal brings up for review the portion of the decree which held that claims 4, 5, 6, 7, and 8 were valid and infringed.

The art of enameling metal is old. Many different formulas and substances are used to form the enamel, but the usual process is substantially as follows: Certain ingredients, usually a mixture of silica or sand, and of other substances having a fluxing property to produce glass when mixed with sand and subjected to heat, are mixed together mechanically. This mixture is called by enamelers the "mix." The mix is then subjected to a high degree of heat and fused, resulting in a vitrified or glassy mass. This is called the "frit." The frit is then put in a mill and ground fine, with a mixture of clay and water, resulting in a liquid paste. This is called the "dip." The metal article to be enameled is then dipped in the paste, dried, and subjected to a very high temperature in an oven or muffle. In some cases more than one dipping and burning takes place. The result is, if the operation is successful, a metal article with its surface covered with an adherent coat of metal.

Prior to about 1892 iron ware had been commonly used for enameling. It was until then cheaper than steel. About that time improved processes in the manufacture of steel were adopted, which resulted in making steel cheaper than iron. It is claimed by the complainants in this case that before Claus made the invention described in his patent there were no means known of successfully producing commercially satisfactory single-coated mottled steel enameled ware, that Claus' invention accomplished that result, and that Claus' patent was taken out for that invention.

The claims in the Claus patent involved in this appeal are as follows:

"4. As a new article of manufacture, a metallic article having a coat of enamel of an intensely alkaline nature permeated by metallic oxides, substantially as described.

"5. As a new article of manufacture, a steel or homogeneous iron article having a single coat of mottled enamel on a partly oxidized metallic surface, substantially as described.

"6. As a new article of manufacture, a metallic article having a mottled coat of alkaline enamel and within said enamel metallic oxides extending from the outer surface of the enamel inwardly, substantially as described.

"7. As a new article of manufacture, a steel or homogeneous iron article having a mottled coat on a partly oxidized metallic surface and having metallic oxides extending from the outer surface of the enamel inwardly, substantially as described.

"8. An enamel for surfaces having therein a preponderance of alkaline constituents together with metallic oxides, substantially as described."

It will be observed that none of these claims is for a process, or for a formula, or for a mix. The first four of them are for a new article of manufacture; the fourth and sixth being for a metallic article of a certain kind, the fifth and seventh being for a steel or homogeneous iron article of a certain kind. Homogeneous iron is an equivalent term for steel. The fourth is for a metallic article having a coat of enamel of an intensely alkaline nature permeated by metallic oxides; the fifth is for a steel article having a single coat of mottled enamel on a partly oxidized metallic surface; the sixth is for a metallic article having a mottled coat of alkaline enamel and within said enamel metallic oxides extending from the outer surface of the enamel inwardly; and the seventh is for a steel article having a mottled coat on a partly oxidized metallic surface, and having metallic oxides extending from the outer surface of the enamel inwardly—each of these claims ending

with the qualification, so frequently used in patents, "substantially as described." It will be observed that the fourth and sixth of these claims apply to any metallic article whatever, whether made of steel or of any other metal capable of being enameled, and entirely irrespective of the use to which the article is to be put. They would apply equally to a metallic sign or a cuspidor or a culinary utensil. The kind of article described in these two claims is metallic, having a certain coat of enamel; that is, in the fourth claim, such a coat of an intensely alkaline nature permeated by metallic oxides, in the sixth claim, a mottled coat of alkaline enamel, and within said enamel metallic oxides. The fifth and the seventh claims refer to a steel or homogeneous iron article. In neither of these claims is the alkalinity of the enamel made the test, but the claim in the fifth is for a steel article having a single coat of mottled enamel on a partly oxidized metallic surface, and in the seventh is a steel article having a mottled coat on a partly oxidized metallic surface, and having metallic oxides extending from the outer surface of the enamel inwardly. The eighth claim is for an enamel for surfaces having therein a preponderance of alkaline constituents, together with metallic oxides, substantially as described. It will be observed that in three of these claims the alkalinity of the enamel is made an essential part of the invention. In the fourth claim it is described as an enamel of an intensely alkaline nature, in the sixth claim as a coat of alkaline enamel, and in the eighth claim as an enamel having therein a preponderance of alkaline constituents. It is therefore important, in construing this patent, to ascertain, in the first place, what is meant by these terms respecting alkalinity, as used in the claims in the patent. The description of the invention shows, in substance, that Claus, the inventor, was a man without much knowledge of chemistry; that he had invented a mix for an enamel composed of ingredients, some of which contained alkaline ingredients, and others acid ingredients; that he supposed that chemically the alkaline ingredients largely preponderated in the mix; and that such a preponderance of the alkaline ingredients continued throughout the various changes which the ingredients in the mix were subjected to by being fused into the frit, and in the frit, after it had been ground and reduced to a pasty condition, being burned in the muffle, so as to produce the adherent enamel on the finished product. He specifies in his description of the process in the patent a particular formula, as follows: By weight, 130 parts feldspar, 125 parts borax, 70 parts quartz, 25 parts soda, and 17 parts saltpetre. The patent states, after giving this formula, that:

"It will be observed that certain alkaline ingredients, notably feldspar, are greatly in preponderance, thus imparting to the mass an intensely alkaline characteristic which, as above pointed out, is essential."

The proof shows, however, that chemically most of these substances are neither purely alkaline nor purely acid, but they contain various constituents, some of which are alkaline, some of which are acid, some of which constitute a nonalkaline base, and some of which are volatile constituents which disappear when the mix is subjected to the heat of the fluxing process. For instance, 130 pounds of feldspar, which Claus refers to in his patent as notably an alkaline ingredient, is composed of 21.92 pounds of potash, an alkaline constituent, of 23.78 pounds of

alumina, a nonalkaline base, and of 84.30 pounds of silica, an acid constituent. One hundred and twenty-five pounds of borax is composed of 20.32 pounds of soda, an alkaline constituent, 45.74 pounds of boric oxide, an acid constituent, and 58.94 pounds of water, a volatile constituent, which evaporates and disappears in the fluxing process. The following table shows the actual chemical constitution of the mix described in the Claus patent:

ENAMEL OR FRIT.

| Ingredients of Mix | Alkaline Constituents | Nonalkaline Base | Acid Constituents | Volatile Constituents |
|---|---|---|---|---|
| Feldspar 130 lbs. | Potash 21.92 lbs. | Alumina 23.78 lbs. | Silica 84.30 lbs. | None |
| Borax 125 lbs. | Soda 20.32 lbs. | None | Boric Oxide 45.74 lbs. | Water 58.94 lbs. |
| Quartz 70 lbs. | None | None | Silica 70 lbs. | None |
| Soda 25 lbs. | Soda 14.63 lbs. | None | None | Carbonic Acid 10.37 lbs. |
| Saltpetre 17 lbs. | Potash 7.92 lbs. | None | None | Nitric Acid 9.08 lbs. |
| TOTALS | | | | |
| 367 lbs. | 64.79 lbs. | 23.78 lbs. | 200.04 lbs. | 78.39 lbs. |

It is apparent from a review of this patent that Claus applied the term "enamel" to the ingredients of the enamel at every stage of the manufacture. At certain places in the patent he applies it to the mix; in others to the frit; in others to the dip; and in others to the completed enamel on the manufactured article after the entire process is finished. The question, in construing the meaning, in clauses 4, 6, and 8 of this patent, of the references to alkalinity, is what Claus meant by the expression "an article of manufacture having a coat of enamel of an intensely alkaline nature," or "an article of manufacture having a mottled coat of alkaline enamel," or "an enamel for surfaces having therein a preponderance of alkaline constituents." It is proved that chemically the mix specifically described in Claus' patent does not have a preponderance of alkaline constituents. It has, as shown in the above table, 64.78 pounds of alkaline constituents, 200.04 pounds of acid constituents, and 23.78 pounds of alumina, which is not alkaline; and, as I understand, it is not claimed that the frit, or the dip, or the enamel burned on the surface of the completed article, chemically has any larger preponderance of alkaline constituents. But it is claimed that Claus was a practical enameler; that in the enameling art such substances as feldspar, borax, soda, and saltpetre are commonly designated as alkaline substances, being substances commonly used in various preparations which have a fluxing property when combined with sand or silica in the manufacture of glass or of glassy material; that there is a large preponderance of such materials over silica in his mix; and that,.

therefore, his claims in this patent should be interpreted as meaning, so far as the description refers to the alkalinity of the enamel, an enamel made from a mix containing a large preponderance of such alkaline ingredients as feldspar. But in my opinion the difficulty with this theory of construction is that Claus did not apply for any patent for the formula described in his patent, or for a mix made of alkaline ingredients, or of such ingredients as feldspar. What he claims in claim 4 is a new article of manufacture (that is, a metallic article having a coat of enamel of an intensely alkaline nature), and in claim 6 a new article of manufacture (that is, a metallic article having a mottled coat of alkaline enamel), and in claim 8 an enamel for surfaces having therein a preponderance of alkaline constituents. I think that the language in all three of these claims, so far as it relates to the test of alkalinity in the enamel, must relate, in the fourth and sixth claims, to the burned enamel on the completed article of manufacture, and in the eighth claim to the enamel in the condition of the dip as it is prepared to be applied to the surface of the metal to be enameled. The rule is fundamental, in the construction of patents, that the claim in the patent is the measure of the invention. The specification may be referred to to explain any ambiguity in the claim, but it cannot be referred to for the purpose of expanding or changing the claim. Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 24 L. Ed. 344; McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800. The requirement of the patent law that a patentee shall claim in his patent the exact invention is not only to enable the public to use it after the term of the patent has expired, but is also for the purpose of enabling any one to determine what the invention is, which is protected by the patent, and what processes which are not protected by the patent may be used in the same manufacture. A person who discovers a new and useful invention does not obtain a monopoly under the patent laws unless he claims his invention in his patent. Even if he describes his invention in the specifications, and then claims as his invention something he has not invented, his patent is good for nothing. In this case, if a man wished to go into the business of making enameled ware, and examined the Claus patent to see what it claimed and what he would infringe, he would find in the claims under consideration, assuming the Claus patent to be valid, that his manufactured article, when completed, must not have upon it a coat of enamel of an intensely alkaline nature, or a mottled coat of alkaline enamel, and he would find that, in preparing his enamel, when it was ready to be applied to the surface of the metal, it must not have therein a preponderance of alkaline constituents. But in many patents taken out before 1893, and in common practice, the enamel, when prepared for the dip, and on the completed articles, had no preponderance of alkaline constituents. So far as Claus' claims under consideration are concerned, they would not be infringed by any other manufacturer using the very formula described in the Claus patent, or any other formula in which there was a preponderence of such articles as feldspar, or of articles which may have been commonly known in the business as alkaline, but which in fact did not contain a preponderance of alkaline constituents in a chemical sense.

The other feature of Claus' alleged invention was the process of creating mottles by sprinkling metallic oxides on the surface of the articles, after they had been dipped, and before they had been fired in the muffle. The proof shows, and the court below held, that the defendants never used that process, and therefore never infringed any claim for an article manufactured with such mottles. If the claims be construed as being applicable to any article manufactured permeated by metallic oxides, or having a mottled coat caused by the use of metallic oxides, the evidence shows that it was not novel or patentable. The creation of mottles by the introduction into ingredients of metallic oxides, before the articles were immersed in the dip and burned, was old, and well known in the art. I think, therefore, that the fourth, sixth, and eighth claims in the patent are void, on the ground that, if Claus invented anything new, it is not the subject of the claims and that what he did claim is not new.

The fifth and seventh claims of this patent are for a new article of manufacture made of steel or homogeneous iron. The fifth claim is for such an article having a single coat of mottled enamel on a partly oxidized metallic surface, and the seventh claim is for such an article having a mottled coat on a partly oxidized metallic surface, and having metallic oxides extending from the outer surface of the enamel inwardly. It will be observed that both these claims cover any kind of a steel article, whether for culinary or other purposes; that neither of these claims provides that the enamel shall be alkaline; and that the substantial claim is for a steel article having a single coat of mottled enamel on a partly oxidized metallic surface. The evidence shows that the only possible novelty which can reside in these claims is found in its characteristic as a steel article as distinguished from an iron article. Iron articles having a single coat of mottled enamel on a partly oxidized surface, and having metallic oxides extending from the outer surface of the enamel inwardly had been commonly manufactured for many years before this patent was taken out. It is argued that until this patent was taken out a single coat of mottled enamel could not be successfully applied to steel. There is no doubt, upon the evidence, that iron can be more easily enameled than steel, and that, when it became desirable commercially to use steel instead of iron for enameled ware because it had become cheaper, a good deal of difficulty was found in accomplishing the result. The evidence shows that all iron contains minute particles of slag, a vitrifiable substance, and that, when enamel which has been applied to an iron article is fused in a muffle, a fusion takes place between the little particles of slag and the enamel, which creates points or roots of adhesion, and which materially assists in producing a firm adhesion of the enamel to the metal. No such slag exists in steel, and it was found, when it became commercially profitable to substitute steel for iron as a basis of enameled ware, that many of the formulas which had been used for enameling iron could not be successfully used for steel. The evidence shows that some of the manufacturers did not know how to enamel steel. Mr. Frederick Haberman, for instance, who had been a large manufacturer of iron enameled ware, failed in all his efforts, and, upon hearing of Claus' invention, went to Europe and offered Claus

$20,000 for his invention if he would teach him how to use it successfully. About the same time the complainants in this case offered him a larger price, and purchased it. They had been the owners of the Niedringhaus patents, under which they had had a substantial monopoly of the manufacture of a certain kind of mottled enameled metal ware. That patent expired in 1893, and the complainants purchased the Claus patent, and had then purchased and afterwards purchased a large number of other patents relating to the art of enameling. Whether they were unable to enamel steel previously does not satisfactorily appear. They may have bought the Claus patent with the intention of using it in enameling steel, or they may have bought it under the general policy of obtaining possession of all patents which might possibly interfere with their business. The defendants manufactured their ware under a formula which they call "100 granite."

The witness Louis Haberman testified that the complainant, The National Enameling & Stamping Company, while he was in its service, used the same formula of 100 granite in the manufacture of its ware. The evidence which this witness gave upon other subjects in this case was entirely inconsistent with other evidence which he had previously given in other proceedings, and little reliance can be placed upon his testimony. But, whether his testimony that the complainant used the 100-granite formula be true or not, the fact is that there is no evidence in this case that either of the complainants has ever manufactured enameled ware under Claus' patent on a commercial scale. If that had been done, it seems probable that the complainants would have proved it. Indeed, there is no evidence that any one ever made enameled metal ware under the formula of the Claus patent unless the 100-granite formula used by the defendant is an equivalent. The novelty of the fifth and seventh claims rests only upon the theory that Claus invented the process of enameling steel with one mottled coat of enamel. That was the theory upon which the patent was really granted. The application was originally rejected by the Patent Office on the ground that all the claims were anticipated by prior patents for enameling iron ware. Affidavits were then submitted to the Patent Office to the effect that none of the processes of these prior patents for enameling iron could be successfully used in enameling steel, and it was upon this ground, and because it was claimed that Claus' invention would enamel steel with one mottled coat of enamel, and that no existing patent would successfully accomplish that result, that this patent was allowed. But the evidence in this case shows that although, when it became necessary to substitute steel for iron, many enamelers who had successful processes for enameling iron did not know how to enamel steel, there were others who did enamel steel successfully with a single mottled coat by existing processes.

The evidence shows that Mr. Chester Comstock, the manager of the Ironclad Company, manufactured single-coated mottled enameled steel ware for the Ironclad Company successfully for several years before Claus applied for his patent, and that the Ironclad Company manufactured a considerable amount of single-coated mottled enameled steel ware by applying to steel the process described in the patent to Quinby & Whiting. The evidence also satisfies me that the defendant

at one time manufactured a large amount of such ware under the process shown in the Quinby & Whiting patent, and at another time under the Niedringhaus patent, and that such ware was commercially satisfactory and was sold by them in large quantities. The defendant's experts have manufactured and put in evidence in this case such ware, manufactured under the Quinby & Whiting patent, and under the Niedringhaus patent, and I see no reason to doubt that these processes, under which iron ware was treated by a single coat of mottled enamel, can be successfully applied to steel. The fact that some manufacturers did not know at first how to do it, and that successful results might not always have been obtained, even when the formulas were followed, does not prove that it could not be done.

The evidence shows clearly that success or failure in the manufacture of enameled articles depends very largely, not only upon the formula employed, but also upon the degree of heat used, the length of time of the exposure to the heat, and generally upon the skill and experience of the men who conduct the operation. The mere application of a process for enameling iron to the enameling of steel involves no invention if the same result is obtained. In this case it must be borne in mind that the claims under consideration upon this appeal are not claims for a process or for an improved result. The claims are for a completed article of manufacture. If these claims are valid, they cover any article of manufacture which has the qualities described in the claims. It is of no consequence how they are produced if the articles have such qualities, and it is of no consequence whether, when produced, they are superior or inferior in quality. If these claims are valid, the complainants have a monopoly of any article of manufacture which has the qualities described in the claim. It is not a question, therefore, in this case, whether the single-coated mottled steel enameled ware which the Ironclad Company manufactured under the Quinby & Whiting process, or under Comstock's process, or which the defendant manufactured under the Quinby & Whiting process or the Niedringhaus process, or which the defendant's experts have made and put in evidence in this case, was as handsome and attractive ware or as good ware as that made by the complainants, or which might be made under the Claus patent. If the previously existing patents instructed those skilled in the art how to make it, whether it was in fact made or not, it was not patentable as a new article of manufacture. If Claus had claimed his formula, or had claimed his mix, the question would arise whether the invention which he claimed was new. But he did not make any claim for his formula or for his mix or for any similar formula or mix. The claims in controversy were framed to give him a monopoly for the finished article, having the characteristics described in the claim. Such a patent, of course, if valid, would confer upon him a monopoly of all articles having such characteristics, no matter what the process might be by which they were produced. He apparently thought that he had made a new discovery in enameling steel, namely, that if the fluxing ingredients, which he called "alkaline," greatly preponderated over sand in the mix, the enamel would have peculiar properties adapting it to steel. But there is no proof that such a discovery was of any real value as an

advance in the art. The evidence shows that all enamelers are constantly trying new formulas, and that a few formulas succeed while most of them fail. Why some succeed and others fail no one knows. All the experts agreed that, in the present state of chemical science, it is impossible to state what chemical action takes place when glass is produced by the fusion of sand and certain fluxing substances. All that is known is that the ingredients are fused and glass results.

I conclude that the claims in controversy are invalid for want of novelty, and cover nothing which was new in the prior state of the art, and that consequently the portions of the decree appealed from should be reversed, with costs.

WALLACE, Circuit Judge (concurring). I will briefly state some of the reasons which lead me to the conclusion reached by Judge HOLT. The process of Claus may be such an improvement in the art of enameling metal as would sustain a patent. But the claims in controversy are not for a process. They are, all of them, for a new article; and there is no claim for the mix itself as a new article. If the article described in the respective claims was old before Claus devised his mix, or if such article, whether it had been actually made or not, could have been made without any exercise of inventive faculty, it was not new in a patentable sense.

It was not new in the prior art to produce steel articles having a plain or colored enamel of vitreous glaze, as is sufficiently shown by the patent to Puttmann & Fliegel for the method of producing steel roofing plates, nor to enamel steel metal ware with a mottled coating, as appears by the patent to Dubois & Stewart. It was old in the prior art to produce metal articles having a single coat of enamel presenting a mottled appearance. The mottled appearance was due to rust spots on the metal obtained by the oxidation which occurred during the process of drying and burning the enamel mass upon the metal. The extent and character of the oxidation was influenced by the constituents of the mass. In the old art these constituents were largely acid, and, being liberated in the heating and drying process, caused the rust spots upon the metal which gave the mottled effect. In hard metals like steel, because formation of rust does not take place so readily, the oxidation does not occur "to such a degree as is required to produce a good appearance"; i. e., it does not show the variety of spotting which is desirable. All this sufficiently appears in patents which were granted to Claus in England and in Germany about the same time his application was made for the patent in suit. It is apparent from his statements in these patents that Claus conceived that the mottling on metals like steel could be effected more advantageously by increasing the alkaline constituents of the mass, and, instead of relying upon the acid or oxidizing constituents, powdering the mass with metallic salts after it is spread upon the metal and before drying, and thereby an enamel could be produced having a greater variety in its mottles and a greater transparency. The evidence in the present record respecting the prior art shows that this is all of which he could have been the inventor or discoverer at the time of the application for the patent in suit. It may be that his

process has advantages in other respects; but, so far as it produced a new article, the improvement in the article itself was mainly a matter of decoration. The process claims of the present patent are ample to secure to Claus his real improvement in the art, if he made any.

The claims for a new article of manufacture cannot be limited by anything which appears in the specification to the real invention of Claus. It is only when a new process introduces new characteristics into the manufactured article by which it can be identified and distinguished from all preceding manufactures that the article itself becomes patentably new. As has been said, it was old in the prior art to produce enameled steel articles; and it was also old to produce metal articles having a single coating of enamel mottled by metallic oxides. If the article which is the subject of the several claims has any new characteristic, it is because of an enamel coating of the particular alkaline quality enumerated in the claim. An enamel of an "intensely alkaline nature" or "having a preponderance of alkaline constituents" is any enamel "which will give a strongly alkaline reaction" in the language of the specification. In practicing the process of Claus this degree of alkalinity is to be introduced in the preliminary step, that of compounding the mix. But within the meaning of the claims in controversy it suffices if the coating when ready to be applied to the metal, or after it has been applied, has such an alkaline quality. The prior patent to Niedringhaus for a process of producing single coated mottled enameled iron ware shows an enamel which is almost identical in its alkalinity with the enamel of the claims. All of the claims are anticipated by the Quinby & Whiting reissue patent alone, and reference to the other prior patents is unnecessary, unless it involved invention to use steel instead of iron in applying the enameling process. The process of that patent would produce a metal article having a single coat of mottled enamel permeated by metallic oxides on a partly oxidized metallic surface, the oxides extending through the enamel; and the enamel itself would have the alkaline characteristics of the patent in suit. That the process of enameling other metals could be applied to steel without invention by those skilled in the art, so as to produce the mottled enamel, is too clear for argument. If it should be conceded that it could not have been applied as economically, or so as to produce as desirable an article in appearance or for culinary purposes, or an article as desirable or as advantageous in any other respect, the fact is quite immaterial. The claims are not for an improved article of mottled enameled ware, but for any article having the identifying alkaline quality and the other enumerated characteristics. . . . .

I cannot agree with the argument for the appellees, which prevailed with the court below, that the alkaline characteristics of the enamel of the claims are to be determined solely by the constituents of the mix. Undoubtedly claims 4, 5, 6, and 7 refer to the enamel in its completed state, after the coat has been dried upon the metal, and claim 8 refers to the enamel when it is ready to be coated upon the metal. It seems plain that the identifying characteristics of the enamel are those which then exist in it. If it can be found that it is then alkaline, or intensely or preponderatingly alkaline, by the litmus

test or any test which those skilled in the art can apply, the claims are satisfied so far as they refer to the alkaline characteristic. In the specification the term "enamel" is applied to the coating in all stages of its manufacture, to the mix, to the molten and ground or pasty mass when ready to be applied as a coating, and to the coating after it has been applied to the metal. In one sense the mix is an enamel. It is an inchoate enamel. But the enamel of the claims is the perfected article. The proportions of the ingredients of the mix disappear in the frit or mass, and are no longer capable of being traced. The quality of the enamel depends upon the influence of what occurs in the smelter and what survives the smelter, and can be found in the frit. If Claus thought that in all stages subsequent to the mix his compound was alkaline because of the alkaline qualities of the mix, and that to know the mix, therefore, was to know the final enamel, he was grossly ignorant; but his ignorance does not require those skilled in the art to suppose that the quality of the enamel, either after it has been applied to the metal or when it is ready to be applied to the metal, is to be ascertained by testing the quality of the mix. They could rightfully assume that it was to be found by testing the quality of the completed enamel, either by such a test as was applied to it by complainants' expert, Banks, or by the defendant's expert, or by some other test known to the art. Such a test would show the alkalinity of the frit, but would not show the alkalinity of the mix. A test of the alkalinity of the frit would, therefore, seem to be the best criterion of the alkalinity of the enamel.

Courts lean towards reading into the claims of a patent such limitations as will save the real invention as disclosed by the specification and the prior state of the art. But when the claims are drawn in broad and nebulous terms, with the apparent purpose of enabling the patentee to monopolize an important industry, the courts should be slow in attempting to sustain their validity by narrowing them beyond the boundaries which are clearly warranted by the specification.