## RAILROAD SUPPLY CO. v. ELYRIA IRON & STEEL CO.

(Circuit Court of Appeals, Sixth Circuit.    April 7, 1914.)

### No. 2322.

PATENTS (§ 328*)—INVENTION—RAILWAY TIE PLATES.

The Wolhaupter patents No. 538,809, claim 8, No. 691,332, claims 1, 2, and 3, and No. 721,644, claims 7 and 9, all for railway tie plates, are void for lack of invention, in view of the prior art.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; William R. Day, Judge.

Suit in equity by the Railroad Supply Company against the Elyria Iron & Steel Company. Decree for defendant, and complainant appeals. Affirmed.

T. E. Brown, of Chicago, Ill. (C. C. Linthicum and Clarence E. Mehlhope, both of Chicago, Ill., of counsel), for appellant.

F. F. Reed and Edward S. Rogers, both of Chicago, Ill., and James Negley Cooke, of Pittsburgh, Pa. (F. P. Fish, of Boston, Mass., of counsel), for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and SATER, District Judge.

SATER, District Judge. The plaintiff is the owner of the three Wolhaupter patents numbered 538,809, 691,332, and 721,644, issued May 7, 1895, January 14, 1902, and February 24, 1903, respectively. The evidence before us is said to be the same as that on which the case was heard not only in the District Court, but previously by Judge Kohlsaat, in Railroad Supply Co. v. Hart Steel Co., 193 Fed. 418. The trial court, as the result of an independent study, concurred in the conclusion reached in such reported case and dismissed the bill. The case stands for decision on appeal.

The plaintiff charges that the defendant, by its manufacture of certain tie plates and its sale of the same through a selling agent, the Hart Steel Company, to the Atchison, Topeka & Santa Fé Railroad Company, infringed claim 8 of the plaintiff's first patent, claims 1, 2, and 3 of its second patent, and claims 7 and 9 of its third patent. The respective claims so alleged to be infringed are as follows:

"(8) A railway tie plate formed on the under side with devices more or less sharpened adapted to penetrate and engage the tie, and on its upper side with a series of flanges on which the rail rests, substantially as described."

"(1) A railway tie plate provided on its upper side with one or more flanges on which the rail may rest or by which it is directly sustained, and on the under side with one or more tie-engaging flanges extending parallel with the upper flanges and directly beneath the latter, substantially as described."

Claim 2 is the same as claim 1, excepting it specifies by insertion after the word "latter" that the lower flanges are "sharpened to permit them to readily enter the tie."

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Claim 3 is made different from claim 2 by adding before the words "substantially as described" the further element:

"And on the upper side with an additional flange or flanges extending above the plane of the rail sustaining flanges and adapted to receive the lateral thrust of the rail."

"(7) A tie plate provided in its rail supporting surface with transverse grooves or channels, and at one margin of said supporting surface with a transverse rail-abutting shoulder."

Excepting the limiting phrase, "reaching to the edge of the plate," added after the words "grooves or channels," claim 9 is the same as claim 7.

In support of its defense of noninfringement, the defendant avers: (1) That the state of the art and of tie plate manufacturing on the respective dates on which the three letters patent were issued was such that each and all of them are void for want of novelty or invention; (2) that if, however, any patentable invention is disclosed in any one or more of the letters patent, the claims must be limited to the specific devices therein set forth, and cannot be so broadened as to include the defendant's tie plate; and (3) that there is no patentable combination shown in the specifications and claims of any of the letters patent, in that the different elements or parts which are claimed to be in combination are all old individually and collectively, and are mere aggregations, having no correlative or modified functions or action upon each other or any joint contributive action in producing any new result, either originally or in Wolhaupter's devices.

A cross-section or end view of the tie plate covered by the first of the patents in suit and drawings of the tie plates delineated and described in the second and third of such patents, respectively, are successively shown as follows:

Wolhaupter Device, First Patent.

Wolhaupter Device, Second Patent.

Wolhaupter Device, Third Patent.

The modified forms of the T-shaped plates appearing in the third patent, on account of their general resemblance to the form above shown, need not be reproduced.

The first of the next following illustrations represents a form of tie plate manufactured by the plaintiff for commercial use, and claimed by it to be within the terms of the patents and to be infringed; the second, that made by the defendant:

Plaintiff's Tie Plate.

Defendant's Tie Plate.

The form of plaintiff's commercial plate may be varied by the use of additional top surface grooves and rail sustaining flanges.

The primary question is the validity of the patents in suit. It is not necessarily the only question for decision, nor will the correspondence of defendant's device with some one or more of the claims in suit conclusively settle the question of infringement. Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 568, 569, 18 Sup. Ct. 707, 42 L. Ed. 1136. In view, however, of the resemblance between the tie plates last above shown and of the manifest dissimilarity in appearance between the plaintiff's tie plates in commercial use and those shown and described in the drawings and specifications, the construction, whether broad or narrow, to be placed on the patents, if valid, becomes determinative of the rights of the litigants. The two questions are so related and so dependent on the prior state of the art that a consideration of the one necessarily runs into that of the other. The transition from the relatively small and lightweight engines and cars which characterized early railroading to the larger, weightier, and speedier engines and heavier, more capacious, and more heavily loaded cars provoked activity among inventors in devising means, including railway chairs and tie plates, to prevent the spreading of the track, due to lateral strain, and the destruction of the tie from abrading and cutting action of the rail. Before Wolhaupter applied for the first of the patents in suit, tie plates had assumed, as regards their lower portions, two well-known styles or forms: (1) Those whose downward-extending ribs or flanges were adapted to enter the tie longitudinally and parallel with its grain, so as to separate, but not to cut, the fiber; and (2) those whose downward-projecting devices were so disposed as to extend transversely of the grain of the fiber, and, in consequence, to cut into and sever the same. The distinctive character of each of the forms and the theory of which it is expressive are recognized by Wolhaupter in his patent No. 530,738, issued in 1894, as well as by his predecessors, Reece and Servis, in their respective patents, No. 488,662, 1892, and No. 524,868, 1894. Those of the second form have, with substantial uniformity, employed but two shallow continuous lower ribs, excluding from con-

sideration those on which mere projections are used. The apparent reason for adopting that form of construction is the relatively greater resistance of the transverse ribs not only to the force applied to imbed them in the ties, but also, on account of their pressure throughout their entire length against the compressed or severed fiber, to the outward or lateral thrust of the rail. With equal uniformity, patentees of plates of the first form have called for more than two (i. e., a series of) lower flanges with comparatively sharp lower edges and of greater length in comparison with both the lower ribs of those of the first form and also the thickness of the body of the tie plate. Their greater number and greater length are designed to increase their resistance to the lateral pressure of the rail, such resistance being restricted to the friction of the fiber against their sides and its compression by their blunt ends. For his patent of 1894, and for each of those in suit, Wolhaupter chose a device of the first above-mentioned form. In that of 1895 he alludes to the further well-known classification of plates (whatever direction or character their flanges may assume) with reference to their top surfaces —those having such surfaces smooth and those having flanges to receive the outward thrust of the rail. As his patent betrays a knowledge of variously constructed plates then on the market, he might well have further recognized and specifically named those whose upper surface is grooved or channeled. Experience taught that the lateral thrust of the rail against the outer top flange of tie plates, having such, caused the under flanges engaging the tie lengthwise to compress the wood fiber, and that such compression permitted the plates to creep toward the end of the tie, thus widening the gauge and increasing the pressure and abrading action on the spike. On account of thus lengthening the depression or indentation made in the tie by the lower flanges, it was, he says, practically impossible, when the plates had once moved, to return them to their original and proper position. He therefore, in such patent—the first in suit—provided a preferably truss-shaped, or, as distinguished from a flat or plain top surface, a "corrugated" or ridged plate on which to rest the rail between two upward-projecting flanges against which the rail abuts, and blunt or square-ended, regularly stepped, lower flanges, supplementary to the spikes, which lower flanges are cut on a line diagonal with the rail, are preferably made with comparatively sharp lower edges, and extend downward directly below the grooves or valleys on the top of the plate sufficiently to become rather deeply imbedded in the tie. If preferred, the plate, instead of the flanges, may be cut diagonally to the rail. The distinguishing feature of his device is not a series of relatively narrow, flat-topped, supporting surfaces suitably spaced apart, i. e., a corrugated top surface for the plate, as distinguished from a flat or plain top surface; for, in alluding to the permissible variations in construction, none of which was to depart from the prime object of his invention, which is the stepped flanges or lower stepped projections, he states that the flanges may be divided; that instead of flanges stepped projections may be used; that a square, instead of a beveled, plate may be employed, and the under flanges alone be stepped; that but one end of the plate need be stepped; or that flanges having one or more of their ends stepped

might be applied to a flat plate or to the numerous other constructions of plates then on the market. His top surface construction may be entirely omitted. Disregarding his thirteenth claim, which relates wholly to spike holes, each of his remaining 13 claims covers his lower flanges, and but 4 of them mention his upper flanges. The body of his plate may be changed, or may assume the form shown in some prior invention, but his stepped form of lower flanges or projections must be used, else his purpose to prolong the life of the tie cannot be attained. The language employed in his patent precludes the substitution for them of any alternative form. To locate his flanges parallel with the rail necessitates an abandonment of the "prime object" and "essential idea" of his invention, which he declared to consist in providing a plate having on its under side a series of stepped flanges or projections arranged in a diagonal line with respect to the rail flange. The purpose of his peculiar form of construction is that the plate, after it has by lateral pressure been longitudinally displaced, may, for the purpose of prolonging the use of the tie, be taken up and the original gauge restored and the spikes relieved of undue pressure by so placing the plate on the tie that one of its flanges will, by pressure make a new indentation and each succeeding flange will fit into a previously formed depression, with its blunt end abutting against the previously compressed fiber, whose power to resist the outward thrust of the rail is enhanced by the depth of the indentations produced by his necessarily somewhat lengthened flanges. He contemplated two adjustments of the character mentioned, and, if stepped flanges be placed at both ends of the plate, additional readjustments to continue the life of the tie may be made by turning it end for end. If this last form of construction be adopted, it would seem there must necessarily be, to accomplish fully the inventor's purpose, an upward-projecting flange at each side of the plate, to receive the lateral thrust of the rail. It should be said, however, that there is no call in his eighth claim for such flanges. The prominence which he gives to the adjustable feature of his plate and the means of securing the same, as evinced by his later patent, No. 579,509, 1897, convinces us that the thought of a tie plate with other than somewhat lengthy, blunt-ended, stepped flanges or projections to engage the ties parallel with the fiber was not present when the first patent in question was issued, or when he obtained his patent No. 542,787, in 1895; and in his last two patents in suit the expressed preference for flanges of that character declared in 1894 still persisted.

The leading purpose of his second patent, which is conceded to be an improvement upon, and a carrying forward of, the invention shown in the first patent in suit, is to locate his four preferably long, sharp, narrow, longitudinal, tie-engaging flanges directly or substantially beneath his four narrow, preferably flat-topped, rail-sustaining flanges, whose parallel sides are perpendicular to the intervening flat-bottomed top grooves or channels, that the weight may be sustained at points where the pressure on the plate is greatest and buckling thereby minimized. At each side of the top of the plate is a turned up portion to form abutting flanges to receive the thrust of the rail. The only element in his device whose omission was deemed unimportant is the

punched out triangular teeth. His rail abutting flanges and lower ribs are substantially those shown in the patent to Reece, No. 494,692, 1893.

The dominant thought in the patentee's mind, as disclosed by his third patent in suit, was, aside from his purposed economy in the use of old rails, a T-shaped tie plate whose principal flange shall conform somewhat closely to the shape of the upper portion of the rail out of which it is to be made, and whose top surface configuration shall be such that water, sand, and other deleterious substances, such as brine dripping from cars, will drain off or away from the plate. He therefore provided downward-sloping grooves on the top of his plate, which may run parallel with, but are preferably transverse or diagonal, to the tie, and longitudinal tie-engaging flanges projecting from its lower surface, that the suction of the train, which, in passing, is transverse to the plate, may be utilized in clearing the plate of any material that may find lodgment on it. His main holding flange of unusual length, on which he lays stress, is central of the plate. It is therefore made much longer than those at the edge, whose office is to force the wood of the tie inward to a firm and close contact with the central flange, to prevent the lifting of the outer edges of the plate, and to exclude moisture and sand from its under surface. He suggested no substitute for this particular shaped flange, which, as he understood, had in practice been abandoned. On the contrary, he intended to restore it to use and good repute. His other lower flanges are but auxiliary.

All of the flanges and grooves, both upper and lower, of the defendant's commercial tie plate run transversely of the tie. The lower ones are sunk into the tie by the pressure of the loads passing over them, and, by reason of the lateral thrust, compress the wood fiber outwardly throughout their entire length. As compared with the device shown in Wolhaupter's first patent, they are not stepped or given an arched effect to support the tie plate, and do not project immediately below the bottom of the valleys of the upper grooves, but are V-shaped, and extend from a flat under surface at points directly or substantially beneath, but not between, the upper rail-bearing flanges. The defendant's plate has an upward extending flange, like that of Wells, No. 203,570, 1878, and of Goldie, No. 485,030, 1892, against which the rail bears by reason of the lateral thrust. No such element is called for in any of the claims in question, excepting 3, 7, and 9. It has no long, narrow, sharpened flanges, nor a central flange of that character, because they are not necessary to insure efficiency. They extend, like those shown in Wolhaupter's second patent and that of Goldie, No. 485,030, Fig. 1, from directly or substantially beneath rail-bearing flanges, but not to afford means for sustaining the weight "at the points where there is the greatest pressure on the plates." The weight of the passing loads is sustained by the bottom of defendant's plate, and not by its lower flanges. Were it otherwise, in the absence of a central flange, its plates would probably break at the middle. The use, in connection with defendant's device, of a central flange like that shown in Wolhaupter's third patent, or of one approximating it in length, is impracticable. The defendant depends wholly on flanges placed well toward the outer edges of its plate to hold it in position, excepting, of

course, spikes, of which both avail themselves. The use of its plate by defendant has demonstrated that it does not require a central lower flange.

The field of tie plate invention had, at the time Wolhaupter entered it, been so assiduously cultivated as to offer many suggestions to and impose many limitations upon him. The great usefulness of tie plates to so important an industry as that of railroading has apparently induced great, if not excessive, liberality in awarding patents for even slight advances in the prior art. This appears by a comparison, for instance, of Goldie's patent No. 610,179, 1898, with Wolhaupter's patent of 1902, applications for both of which were pending at the same time. If the plaintiff's patents are valid, they are narrow, and entitled to but a limited range of equivalents, whether considered separately or as conjointly used. Invention in tie plates having been sought by so many minds, it is not wonderful that they were developed in many different and independent forms, all more or less original, and yet all having a somewhat general resemblance to each other. No one inventor preceding all the rest hit upon something which underlaid and included all that they produced, and thus acquired a monopoly and subjected them to tribute. The advance in the art was gradual, and proceeded step by step, so that no one acquired an exclusive monopoly, and therefore each patentee acquiring a valid patent became entitled only to his own specific form of device. Railway Co. v. Sayles, 97 U. S. 554, 556, 557, 24 L. Ed. 1053. The extent to which Wolhaupter was indebted to his predecessors in the art will appear from the disclosures made by a few of the many patents in evidence. In all of his devices in question he sought to combine, with strength, lightness of weight and economy in production; but the same intent, sometimes affirmatively expressed, and sometimes not noted, because obvious, is manifested by others whose patents antedate his. The use of an upward-extending flange on one or both sides of tie plates to restrain the rail and receive its lateral thrust was so common prior to 1895 that a citation of earlier patents to show such element is unnecessary. The use of grooves or channels on the upper surface of his plate to serve as a receptacle for sand, grit, and other hurtful substances, and to facilitate their removal and the evaporation of moisture, had been expressly mentioned in the patents of Wells, No. 203,570, 1878, and Dockstader, No. 462,399, 1891, and are seen transversely of the rail in that of Wilson, No. 522,-867, 1894. Dunham's device, patent No. 469,386, 1892, performs the same service, and, in addition, by reason of air spaces beneath the plate, facilitates the evaporation of moisture that may get between the plate and the tie. As the grooves in the Wells patent are parallel with the rail and in the line of the suction caused by the passing trains, they ought, it would seem, to be more effective in freeing the plate or chair of foreign substances than the grooves transverse to the rail shown in Wolhaupter's first and second patents. Dunham, among others, preceded Wolhaupter in the use of a "corrugated" or ridged plate of a truss nature, placed parallel with the tie, and alluded to the fact that a corrugated plate or chair in a groove or recess in the tie had been proposed, probably referring to the Ashcroft patent No. 388,240, 1888.

His plate does not have sharpened lower flanges to enter the tie, or a flat-topped projection extending above the concave surfaces to receive the rail, but the lower contacting portions of his plate must necessarily, to some extent, be depressed into the tie, and, if the top surface of the plate devised by Dunham (Fig. 4) and Wolhaupter, respectively, be made flat, which each of them says is permissible as regards his own device, their plates do not substantially differ, save in the degree of bluntness and the length of their lower flanges. The assistance in sustaining the weight put upon the plate and the exclusion of moisture from beneath it, attributed by Wolhaupter to the sloping or truss nature of the approaching sides of the lower flanges in his first patent, were also secured by the earlier devices of Churchward, No. 508,086, 1893, Worthington, No. 506,963, 1893, Holmes, Nos. 514,465 and 514,466, 1894, and Gabel, No. 530,175, 1894. Blunt or square-ended lower flanges engaging the tie lengthwise and necessarily compressing the wood fiber as the lateral pressure of the rail forces them toward the end of the tie were not original with Wolhaupter but are found in the two early patents of Servis, Nos. 249,407, 1881, and 294,816, 1884, of Holmes, Nos. 495,807, 1893, and 514,465, 1894, the patent of Worthington, and also of Reece, No. 494,692, 1893. Excepting that of Servis (No. 249,407, Figs. 3 and 4), all of the last-named patents show, as does Wolhaupter's, the lower edges of the flanges to be somewhat sharpened. The location of the lower tie-engaging flanges immediately or substantially beneath the shoulders or flanges sustaining the rail, which is the primary thought embodied in Wolhaupter's second patent in suit, is found in the patent of Goldie, No. 485,030, 1892, and, if there be but one upper rail-supporting flange or surface, as claims 1, 2, and 3 permit, in those of Worthington, and of Servis, No. 524,868, 1894. Sellers, by his patent No. 684,466, 1901, preceded Wolhaupter in the thought expressed in the third patent in suit, of manufacturing tie plates from old rails, and in the use of a long, central holding, lower flange and a grooved top surface. Wolhaupter flanked his central holding lower flange with two shorter side flanges, but Wilson had previously done the same thing. Sellers' grooves, like those in the Wilson patent, run parallel with the tie; whereas those in the Wells run parallel with the rail, and those of Wolhaupter may be located either parallel with or transversely of it.

The production of either defendant's device or that of complainant in commercial use necessitates a complete reorganization of the Wolhaupter devices, whether they be considered separately or conjointly. It is clear that, if the patents and claims in question are valid, they must necessarily be so narrowly construed as to relieve the defendant from the charge of infringement. But we prefer to rest our conclusion on other grounds.

The plaintiff rightfully contends that claim 8 is so broad as to embrace any tie plate having on its under side more or less sharpened tie-penetrating and engaging devices and on its upper side a series of flanges on which the rail may rest. No limitation by the drawings or the specific form of description can be imported into it without making it identical with some one or more of the other claims. It was in-

tended and granted as a monopoly upon the broad generic idea of which the form shown in the drawings and description was a species. Wolhaupter endeavored to cover a field of invention far wider than he was entitled to occupy, and the claim must be held void, because it is broader than the real invention. Edison v. American Mutoscope Co., 114 Fed. 926, 934, 52 C. C. A. 546 (C. C. A. 2); National Enameling & Stamping Co. v. New England Enameling Co., 151 Fed. 19, 23, 80 C. C. A. 485 (C. C. A. 2). By like reasoning, each and every of the other claims involved must also be held invalid.

In view of the prior state of the art, which will not be further considered except to illustrate our views, no device constructed according to any of the claims in question involves invention. Wells' patent calls for two projecting lateral flanges to restrain and receive the thrust of the rail and three rail-sustaining bearings or top flanges located in the same horizontal plane. On each side of the central flange is a groove to lighten the structure without impairing its strength, and to care for sand and grit. Directly below the central rib or flange is a square-bottomed rib to prevent longitudinal and lateral displacement. He does not provide for spike holes; neither does claim 8 call for them. His patent does not suggest that his lower rib may be more or less sharpened; but so old a patent as that of Hudson, No. 142,020, 1873, taught that a V-shaped or other suitably shaped flange might be used instead of a square-bottomed one, and those of Gould, No. 280,030, 1883, Goldie, No. 485,030, Worthington and Holmes, No. 495,807, that the use of two or more sharpened lower flanges was a well-known expedient. Plaintiff's commercial plates show a reduction to two or more, as convenience suggests, of the multiplicity of top grooves disclosed in the Wolhaupter patents, and their top surfaces are thus assimilated to that of Wells. In such commercial plates the plaintiff also reduces to two the multiplicity of lower flanges shown in Wolhaupter's patent in question, and places them transversely of, instead of parallel with, the tie. Neither the plaintiff nor Wolhaupter deemed such reduction as to grooves or flanges or the change in the course or form of both from a position parallel to the fiber to one transverse of the same to be without the terms of the patent. If a reduction in the number of flanges and a change in their form does not involve invention (and we think it does not), and is but an authorized application of the rule of equivalents, then to increase the number of flanges (in the Wells patent, for instance) and modify the form must also fall within the same rule; but this makes the Wells patent anticipatory not only of the first, but of all three, of Wolhaupter's devices, as claimed in this case. The fact that Wells' device spans two or more ties and is a railway chair does not preclude consideration of it as anticipatory. Sectioned or reduced in length so as to span a single tie, as does that of Goldie, it assumes the form of a tie plate. Railway chairs are a species of railway plates or track fastenings, and possess the essentials of a tie plate, in that they maintain the alignment of the rails and the gauge of the track, and are so closely allied to tie plates that both inventors and the patent office have applied the name of the one to the other, as appears from the patent of Goldie, No. 426,530, 1890, and Parsons, No. 465,492, 1891.

Reece and Holmes in their respective patents, Nos. 494,692 and 495,-807, 1893, each wished to provide a series of stops, or abutments, or flanges on the upper surface of their respective devices to receive the outward bearing of the foot flange of the rail. Wolhaupter carried this same idea into his second patent. Wells had employed a lower flange extending from a flat under surface and directly beneath an upper rail-bearing flange located between grooves or valleys. A series of rail-bearing flanges extending above the adjoining top surface grooves or depressions are found in Wolhaupter's first patent in suit. Such a modification of any one of the devices shown in the last four named patents as would make it conform to the device claimed in the second patent in suit would not involve the exercise of the creative faculty.

The Hart patent, No. 696,964, 1902, provides for lower flanges parallel with the fiber of the tie and for grooves on the upper surface reaching from the middle of the plate to its outer edges, parallel with the rail. This is one of the forms permitted by the third Wolhaupter patent. The only difference between the two is that Hart's patent shows four lower flanges, instead of three; his outer flanges being longer than those centrally located. Figures 10 and 11 in Wolhaupter's patent No. 691,037, 1902, both show a series of upper surface grooves. Figure 11 further shows that one long central lower flange is deemed by him a modification of the two lower flanges shown in figure 5. There can be no originality, in view of the prior art, in the use by Wolhaupter of a multiplicity of lower flanges, as compared with the patent of Sellers, nor an avoidance of the rule of equivalents by his use of three flanges instead of the four found in the Hart patent. In view of the Goldie patent, No. 610,179, 1898, which has two lateral lower flanges (Fig. 1) (but may have a third at the center of the plate) and a top surface groove, all of which grooves and flanges run parallel with the tie, the recognition by plaintiff and Wolhaupter that a variation in the direction given the grooves and flanges and in the number of each falls legitimately within the rule of equivalents, places the patents of both Goldie and Sellers, and especially that of Sellers, in the anticipatory class, and robs of patentability Wolhaupter's third device as herein claimed. The use of the long lower central flange, as we have heretofore seen, was anticipated by both Sellers and Wilson.

Other questions discussed need not be considered. In view of the conclusion reached, the trial court must be affirmed, and it is so ordered.