## OSHKOSH GRASS MATTING CO. v. WAITE GRASS CARPET CO.

(Circuit Court of Appeals, Seventh Circuit. April 15, 1913.)

No. 1,932.

1. PATENTS (§ 234*)—INFRINGEMENT—EVIDENCE.

Similarity of structure cannot be predicated on similarity of names, nor the mere use of old elements, as new combinations make new inventions.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 370, 381; Dec. Dig. § 234.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—GRASS TWINE MACHINES.

The Monahan & Kieren patents, No. 688,789, for a grass twine machine, and No. 785,070, for a material feeding device for such machines, while valid, are of narrow scope and limited to the specific form of the improvements shown; as so limited, *held* not infringed.

Appeal from the District Court of the United States for the Eastern District of Wisconsin; A. L. Sanborn, Judge.

Suit in equity by the Oshkosh Grass Matting Company against the Waite Grass Carpet Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 194 Fed. 885.

Arthur L. Morsell, of Milwaukee, Wis., for appellant.

Samuel W. Banning, of Chicago, Ill. (Thomas A. Banning, Thomas A. Banning, Jr., and Ephraim Banning, all of Chicago, Ill., of counsel), for appellee.

Before BAKER and KOHLSAAT, Circuit Judges, and WRIGHT, District Judge.

KOHLSAAT, Circuit Judge. Appellant (described hereinafter as complainant) filed its bill to restrain infringement of claims 23 and 24 of patent No. 688,789, granted to Monahan & Kieren, December 10, 1901, for an improvement in machines for making twine having re-

lation "more particularly," says the specification, "although not necessarily, to twine composed of lengths of grass." The claims read as follows:

"23. In a machine for making twine, the combination of means for forcing the material forward, means for bringing the length of the material close together, compression means adapted to compress the material, after the lengths of said material are brought close together, and means, after the material is compressed, for wrapping the twine therearound.

"24. In a machine for making twine, the combination of means for forcing the material forwardly, a funnel into which the material is received, compression-rolls adapted to receive the material therebetween, after said material leaves the funnel, and means, after the material is compressed for wrapping a twine therearound."

The bill also sought to restrain infringement of claims 9, 14, 17, 18, 19, 20, 21, 23, and 24 of patent No. 785,070 granted to the same patentees on March 14, 1905, for an improvement in automatic material feeding devices, "especially adapted for feeding length of grass to the winding and spooling mechanism of grass twine machines," designed to be a simpler, less expensive, and speedier device than shown in the prior art. The claims read as follows, viz.:

"9. In a material-feeding device the combination of a frame constructed for the travel therethrough of the material to be acted upon, a rotatable roll journaled in the frame, a series of revoluble devices co-operating with the roll, each revoluble device provided with a concentrically-curved edge, the said devices being so set that the material is always acted upon by one or more of the curved concentric edges, whereby said material is pressed against the roll and moved along the frame of the machine."

"14. In a material-feeding device, the combination of a frame constructed for the travel therethrough of the material to be operated upon, a rotatable roll journaled in the frame, a series of revoluble devices co-operating with the roll, each revoluble device provided with means for pressing the material against the roll, whereby said material is moved along the frame of the machine, and two rotatable rolls in advance of the first-mentioned roll and adapted to receive therebetween the material so moved along the frame of the machine."

"17. In a material-feeding device, the combination of a frame constructed for the travel therethrough of the lengths of material to be operated upon, a pair of draw-rolls arranged in line with the travel of the material and transverse of the lengths thereof, and roller means for starting or forcing the ends of successive lengths of the material between the draw-rolls, whereby said rolls serve to grasp and draw a portion of the lengths of the material.

"18. In a material-feeding device, the combination of a frame constructed for the travel therethrough of the material fed therein, mechanism for moving the material along the frame, one member of said mechanism being movable and adapted to act at different longitudinal portions thereof successively on the material fed into the machine, and the other member thereof forming an opposing surface co-operating, and adapted, in connection with the successively-acting portions of the other member, to move the material along the frame of the machine.

"19. In a material-feeding device, the combination of a frame constructed for the travel therethrough of the material fed therein, mechanism for moving the material along the frame, one member of said mechanism having a circular path of movement and adapted to act at different longitudinal portions thereof successively on the material ted into the machine, and the other member thereof forming an opposing surface co-operating, and adapted, in connection with the successively-acting portions of the other member, to move the material along the frame of the machine.

"20. In a material-feeding device, the combination of a frame, constructed for the travel therethrough of the material fed therein, mechanism for mov-

ing the material along the frame, one member of said mechanism being movable and having different longitudinal portions thereof provided with differently-positioned grooves adapted to act successively on the material fed into the machine, and the other member thereof consisting of an opposing surface co-operating, and adapted, in connection with the successively-acting portions of the other member, to move the material along the frame.

"21. In a material-feeding device, the combination of a frame constructed for the travel therethrough of the material fed therein, mechanism for moving the material along the frame, one member of said mechanism being movable and adapted to act at different longitudinal portions thereof successively on the material fed into the machine, and the other member thereof forming a rotatable opposing surface co-operating, and adapted, in connection with the successively-acting portions of the other member, to move the material along the frame of the machine."

"23. In a material-feeding device, the combination with a frame constructed for the travel therethrough of the material to be operated upon, of mechanism for moving the material along the frame, one member of said mechanism being revoluble, and having material-engaging means carried thereby and located thereon transversely of or at an angle to the axis of said revoluble member, and the other member of the mechanism for moving the material having a surface opposed to the revoluble member, portions of the material-engaging means of said revoluble member, in the revolution of said member, successively co-operating with the opposing member, and thereby moving the material along the frame of the machine.

"24. In a material-feeding device, the combination of a frame constructed for the travel therethrough of the material to be operated upon, mechanism for moving the material along the frame, one member of said mechanism being movable and adapted to act at different longitudinal portions thereof successively on the material fed into the machine, and the other member thereof having an opposing surface co-operating, and adapted, in connection with the successively-acting portions of the other member, to start the movement of the material along the frame of the machine, and a pair of draw-rolls arranged in line with the travel of the material and transverse of the lengths thereof, and adapted to receive therebetween the lengths of material moved by the material-moving mechanism, and thereby draw said lengths of material therebetween."

On the hearing below the bill was dismissed for want of equity. Of these claims, complainant's counsel says:

"Appellant may well rely on claim 17, which clearly points out that the invention consisted not in the specific form of mutilated or grooved rotating member, but in the more general terms, 'roller means for starting and draw-rolls for advancing the stalks after they have been started.'"

Claims 23 and 24 of the first patent in suit differ only in wording. Both cover means for manufacturing straight grass twine as compared with prior art devices for making twisted grass twine. The steps of each are in substance the same, i. e., means for forcing the material forward, means for bringing the lengths or straws of material close together. (Claim 24 recites the means, i. e., a funnel.) Compression means (claim 24 recites rollers), and means after the material is compressed for wrapping it with twine. There must be read into the claims an endless belt *53* which receives the grass from the forward feeding rollers and carries it into the funnel in order to bring the stalks of grass close together, whence it passes in compacted form into the undriven compression rolls at the discharge end of the funnel. The patent in terms discloses no means for advancing the compacted grass through the compression rolls, which operate only as the grass drives them. It does not appear that the endless belt imparts any for-

ward movement to the stalks of grass after delivering them to the funnel, except such as would flow from the pressure of the oncoming material. The funnel necessarily resists advance more and more as it contracts into a desired twine-sized passageway. It is inconceivable that the grass would gain impetus from the endless belt and first advancing rolls sufficient to carry it through the friction of the contracting funnel, and through the undriven compression roller.

From the evidence, the court is satisfied that the forward travel of the grass from the funnel is effected through the pull of the completed twine actuated by the draw-rolls. The accompanying drawing illustrates the devices of the two claims:

The First Machine for Making "Straight" Grass Twine. Monahan & Kieren Patent No. 688,789.

It will be seen that the fingers or nippers *42* pick up strands of grass from the mass and carry them forward to the feed rolls *46* and thus serve to initially advance the grass, while they also do the selecting and determine the amount to be fed forward at one time. These nippers, of course, may be increased or decreased in number as the quantity of grass desired may be less or more. It is evident that up to the time when the grass passes from the endless belt *53*, there is nothing to indicate whether it is to be twisted or simply wrapped. The twisting device is old in the art, and may be added or removed from any of the devices in suit. Somewhere in the process the cuticle or hard and rough covering of the grass, which is a sedge, is broken and removed. Neither of the patents in suit lays claim to any invention growing out of this feature. Apparently any friction growing out of the use of rollers or other means in advancing the sedge strands or compressing the same produces this result. It is a mere incident in the process of reducing strands to a somewhat compact body, and not a patentable element or feature of the devices in suit. It does not appear from the record that any practical machine was ever constructed under either claim 23 or 24. Complainant's brief deals liberally with the proposition that the first patent in suit was the first to devise a machine for the manufacture of straight grass twine. It must be borne in mind that the patent is not for a function, but for a device. The prior art teems with devices for making twine out of

hay, straw, sisal grass, manila grass, fiber, flax, rags and other available material. The Lowry patents differ mainly from the first and second patents in suit in that they add twisters and use different advancing means. Without these, with little or no modification, they could be used in making straight grass twine. The same is true of numerous other patents. Appellee's brief at pages 155 and 156 names over 30 prior patents, some of which show straight grass twine.

Mitchell patent, No. 63,921, shows the woof of a matting formed of manila grass, made up of overlapping fibers, but does not disclose the machine for making it. Here Russian grass is suggested as a substitute for manila grass.

British patent to Lyman shows a device for overlapping longitudinally strips of horn and then wrapping them with a helically applied thread, so as to make a twine-like article of straight lengths of material. Other patents cover the overlapping and wrapping of straight Tampico fibers, quills, and other articles for corset stiffeners. Thus the idea of making string and string-like articles from straight, untwisted material is old. It would seem that complainant has made no advance over the prior art which would justify his claim to a basic patent, so far as said claims 23 and 24 are concerned.

Appellee (hereinafter termed defendant) insists that the device of those claims is an aggregation merely, being the union of feeding mechanism with wrapping mechanism, neither one of which is dependent upon the other. Inasmuch, however, as the claims call for a straight grass twine made under complainant's device, wherein it is seen that the binding or wrapping of the grass contributes in a way to the forward movement of the strand from the funnel and compression rolls through the meshing of the blades of grass with the rearward ends of those the forward ends of which are already made into twine, it cannot be said that the wrapping mechanism does not in any degree co-operate with the advancing mechanism. The device of the two claims in suit are deemed to be valid for the purposes of this hearing when limited to the specific form shown in the patent.

It will be noted that the several claims of the second patent, No. 785,070, here in suit, all appertain to a feeding device only. In answer to question 334, at page 341 of the record, Monahan, one of the patentees, says that all of the feeding device of the first patent is omitted in the second, excepting only the feed rollers 46 shown in said first machine, which takes the grass from the nippers as shown in the first patent. These rollers are marked 29 in the second patent. The nippers of the first patent are replaced by a series of laterally arranged concentric segments carried by a rotating shaft and co-operating with a roller located directly under it. These segments are arranged on the shaft in such a manner that the acting concentric portions thereof successively follow each other; so that at all times some lengths of grass are engaged and forced longitudinally. Provision is made for independent movement of the segments in order to accommodate them to variations in the thickness of the lengths of material being operated upon, and hence they must rise varying distances. Each of the seg-

ments is provided with a groove or double groove, if desired in the edge thereof. After passing between the segments and underneath the roll co-operating therewith, the advancing ends of the grass pass between the rolls 29 above named and are drawn into a downwardly inclined funnel adapted to receive the same. To this funnel a so-called laterally-shaking movement is imparted to facilitate the sliding downwardly therein of the lengths of grass. As the grass advances, it converges into the narrowing neck of the funnel whereby the patentee claims it is compressed.

"It will be understood," say the patentees, "that our improved feeding mechanism is adapted to be used in conjunction with the winding and spooling mechanism of machines for making twine. * * * the funnel 43 leading and adapted to convey the material to the winding mechanism."

It would clearly involve the pull of the wrapping device, or of draw-rolls or other pulling element to extricate the compressed or compacted strands of grass from the narrow discharge end of the funnel where the second patent leaves it. Whether the action of gravity of the second patent would operate more effectively than the endless belt or curtain of the first patent seems doubtful. Of course, it would be a cheaper device; and that is one of the advantages the patentee claims for it. Lowry patent, No. 654,991, also uses the force of gravity and the converging, compressing funnel. He also provides a spread-out layer of grass from which his selecting device withdraws its substantially prearranged quantity of grass to be advanced. The Lowry twister is located close to and in alignment with the forward outlet of the gravity fed funnel. The grass in Lowry's machine passes into a short funnel-shaped sleeve which delivers the straw into the jaws of a pair of arms which are adjusted to effect the twisting. Were this device missing, Lowry would have had straight grass twine.

Fig. 1.

From the accompanying drawing, being Fig. 1 of second patent, the construction of complainant's latter device will be readily understood.

It has the merit of simplicity, speed, and cheapness. Whether the strands would emerge from the cylinder end of the funnel unassisted by further pulling influence is not clearly shown. It seems reasonably certain, however, that it would require the assistance of the attached wrapping mechanism or something having a pulling function to secure a complete delivery.

As before stated, nothing is said or claimed in this or either of the patents in suit in regard to the destruction of the epidermis of the grass straws. That result follows as an incident to the feeding elements of the claims in suit, and may not be appropriated as a patentable feature of the devices in suit. American Grass Twine Co. v. Choate et al., 159 Fed. 429, 86 C. C. A. 409.

[1, 2] The result might, from all that appears, flow from any forcible manipulation of the grass, and may not be claimed as indicating an infringing machine. In view of the state of the twine art, and, it may be said, of the grass twine art at the date of the application for the second patent in suit, complainant is not entitled to any broad claim for a device adapted to the manufacture of straight grass twine. It is of little significance that in the said claims or some of them a similarity of names may occur, if such be the case here. Similarity in fact must be established. Nor can similarity of structure be predicated upon the mere use of old elements; new combinations make new inventions. Fuller v. Yentzer, 94 U. S. 296, 24 L. Ed. 103; Gill v. Wells, 22 Wall. 14, 22 L. Ed. 699; Seymour v. Osborne, 11 Wall. 555, 20 L. Ed. 33; Standard Computing Scale Co. v. Computing Scale Co., 126 Fed. 639, 649, 61 C. C. A. 541.

We assume for the purposes of this hearing that said claims are valid, but only for the specific invention disclosed in the complainant's feeding device. It appears that complainant has not made the device of these claims the basis of its general trade, but has constructed and placed on the market what it terms its commercial machine. In this device there was added to those above described a steel nose which was attached to the funnel end at an angle to the inclined floor of the funnel, so that the grass blades in passing out would be sharply bent and more completely broken or freed from the hardened cuticle. To this they add a wrapper. Manifestly, they could, if desired, have used a twister instead, or both of them. Thus the grass is drawn in part, at least, from the nose by the pull of the wrapper and wrapped, making a complete machine.

The segments, as is the case with the nippers, are charged with a double function. They select or pick up the strands of grass from the lower roll and carry them to the advancing rollers, whence it is delivered to the vibrating downwardly inclined funnel.

The defendant's machine is based upon Wessel patent, No. 896,783, granted August 25, 1908, for a grass twine machine.

"The invention," says the patentee, "is directed chiefly to improved mechanism for selecting from a suitable grass holder, the blades of grass in a

regular and uniform order of succession, and delivering the same to the twine-forming mechanism proper."

He claims that the invention involves minor, but important, novel features. Herewith is presented a drawing of its machine as used.

Appellee's Machine.

The machine neither needs nor employs anything like the undriven compression rollers of the first patent. Nor does it use side boards. The grass is separated and carried by the notched disc as shown in fig. 8 of the Wessel patent, presented herewith, around into the

throat formed by the tapering end of the upper roller *8* as shown by the defendant's commercial machine above set out, and the lower roller *7*; the former being formed so as to taper inwardly, and the latter having a bell-shaped end ·(not shown in drawing) both screw-threaded, without advancing the grass materially. From this throat the grass is flexed inwardly by the helical screw-threads, the outer of which is coarser than the inner, until the bunch of grass is flexed into the bite of the feed-rolls, *7* and *8* of the drawing of defendant's machine. Up to this time the material is not substantially advanced, except as it is flexed towards the bite of the feed rolls. At this point the rolls are smooth. Here the advance of the material is fully caught in the forward drag of the rolls. Complainant's expert says of this position:

"Mainly I should say withdrawal is effected, that is withdrawal by end-wise movement, by the plain portion of the lower roll and the opposed grooved portions of the upper roll, but it is possible that at times there might be some advance of the material before it passes into the fine grooves on the upper roll, since the feed of grass may vary slightly, and if there is sufficient grass, or the blades are particularly thick, that there might be some advance before the lengths reach the fine grooves. I might add that, in witnessing the oper-ation of the machine, it would be impossible to discern this with great exact-itude, because the initial endwise feeding rolls are operated at a high speed and the grass moves forwardly in rapid longitudinal succession."

These rollers are indicated by numerals *47* and *38* in the drawings of this Wessel patent. They in turn, after the grass has been flexed into their bite, force it forward into and between "a pair of heavy crushing rollers *48* and *49*, the latter being adjustably weighted or screw pressed, so as to increase its pressure against its under co-oper-ating roller *48*. This the patentee Wessel says is intended to crush and flatten out blades of grass and thereby increase the flexibility of the grass by disintegrating the brittle portions thereof."

From the above drawing of defendant's commercial machine, it will be seen that the upper roller *11* of the second set of rolls, correspond-ing to roller *49* of Wessel, is screw-threaded in such a manner as to force the grass into a compacted stand at or near the middle of the rollers and thus deliver it through "a rearwardly tapered concentrating spout," to the succeeding rolls also compression rolls which actively draw it forward through the funnel and pass it on to the draw-rolls and wrapping device. It is at all times under roller control. Com-plainant's spring-pressed undriven compression rollers are entirely wanting.

Defendant claims that it employs no means for bringing the material together, since it retains practically the bunched relation of the straws to each other produced by the notches on its disc, and never becomes anything like a layer. Such tendency to spreading out as it may dis-close will be fully corrected by the inwardly tending screw threads upon the upper one at its second set of rollers. Complainant's experts, in comparing the devices of the two patents in suit with that of de-fendant reject defendant's element of the notched disc and its opera-tions, and assume that the threaded or grooved rollers *7* and *8* of de-fendant's commercial machine are the equivalents of complainant's nippers and segments. This is manifestly unfair; nor is it fair to compare defendant's notched disc with complainant's cross-feed mech-anism. The former selects and feeds forward from the mass only measured portions thereof, while complainant's cross-feed device makes no selection or separation. It simply spreads the grass out for the use of the nippers and segments.

From figure *8* of the Wessel patent, it will be seen that the mass of grass shown as *Z* between the posts *18* and *22* is fed down into a curved slot *17* into which the periphery of the notched disc extends. The notches are thus in position to seize mouthfuls of grass, so that, as the disc revolves, the former select and carry away from the mass their several measured amounts of stalks. The butt-ends of the ma-terial in the mass overhang the rollers *7* and *8* as shown in cut of de-

fendant's machine. The disc carries its several notches with their mouthfuls in succession about four inches apart, into the throat of said rollers, being the space between the outside ends of 7 and 8 caused by the bell-shaped outer end of 7 (not shown), and the inwardly tapering end of roller 8; both of said rollers being threaded so as to flex the grass into their bite as above stated. Thus, while complainant's nippers and segments select from a spread-out layer of grass, their several measured portions of grass and pass it to the feed rollers of the patents in suit in defendant's device, a measured quantity from the mass is forced into defendant's disc notches, which in turn deliver it to the flexing influences of the feed rollers and thereby to the bite and advancing parts thereof. As counsel for defendant say:

"In complainant's machine the measuring and forward feeding are effected by one and the same agency, while in defendant's machine these operations are individually and successively performed by different agencies."

Defendant's feeding elements, for purposes of comparison, should include the selecting and delivery elements of its machine, otherwise its vital parts are eliminated. So considered, and in view of the conditions of the art, the lack of novelty in the compression and draw-roller employed, the absence of the undriven compression rolls at the end of the funnel, the downward tending agitated funnel, and of the absence of the nose applied at an angle to the floor of the funnel of the commercial machine of complainant, the presence of continual forward pull at all times up to the winding, even granting that defendant's second pair of rolls constitute a cuticle destroying device, the presumption of validity growing out of the grant of the Wessel patent, which is owned by defendant, it is apparent that defendant's machine differs from that of the patents in suit in a greater degree than that in which they differ from each other. Indeed the difference is such that it is difficult to compare them. For the reasons aforesaid, they are held not to infringe, and the decree of the trial court is affirmed.